## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **Deana Pollard Sacks,** | § | |
| *Plaintiff* | § | |
| | § | |
| **vs** | § | **Civil Action No. 4:18-cv-03563** |
| | § | **JURY TRIAL DEMANDED** |
| **Texas Southern University, Ahunanya** | § | |
| **Anga, James Douglas, Fernando Colon-** | § | |
| **Navarro, Ana Otero, and April Walker,** | § | |
| *Defendants* | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Professor Deana Pollard Sacks is a renowned scholar and tirelessly devoted teacher. She is among the most decorated and published professors at the Thurgood Marshall School of Law ("TMSL") at Texas Southern University ("TSU") and routinely donates her time to review sessions and after-hours study sessions to help students. Despite Professor Sacks's accolades and commitment, she is the latest in a long line of TSU educators that have been discriminated against based on their race and gender. This legal action seeks damages for TSU's continuous and ongoing discrimination against Professor Sacks.

## I.      Introduction

1.      Professor Sacks is a Caucasian woman. TSU is a historically black college or university ("HBCU") with a long history of race and sex harassment, including extraordinary threats to physical safety and malicious, calculated

attempts to force out Caucasians and women. The egregious racist and sexist hostile work environment has been the subject of dozens or hundreds of EEOC charges of discrimination lodged against TSU and TMSL, and dozens or hundreds of discrimination and civil rights lawsuits over the years filed against TSU and TMSL. The law school has been reprimanded and fined in recent years for its "persistent" refusal to abide by American Bar Association guidelines concerning sexual harassment and equal pay. TSU and TMSL's discriminatory actions against Professor Sacks are par for the course with regard to how those institutions treat Caucasian and female employees. Among other remedies, Plaintiff seeks prospective injunctive relief to put an end to the long history of race and gender based abuse, and gross misappropriation of taxpayer dollars and abuse of university processes to further the racist and misogynist culture of TSU/TMSL.

2.      Certain non-white administrators and professors, including those who are named Defendants, target white and female employees for harassment and abuse, to attempt to force them out of their jobs. The many and varied forms of race and sex harassment create an environment so hostile to Caucasians and women—and in this case, Professor Sacks—that those individuals feel forced out of their jobs. Such actions include:

a.      Physical threats, assault, battery, and property damage to targeted persons;

b.      The use of state processes and state monies to further the racist and misogynist agenda of certain non-white administrators and professors, including making false accusations against targeted persons to force them to expend time and money to defend the embarrassing and bogus charges, which are usually dropped in the end;

c.      Failing to pay monies earned, forcing the target to jump through hoops for months to obtain the unpaid monies, which are usually paid in the end;

d.      Verbal abuse, yelling, cutting off the target when the target attempts to speak in meetings, and other bullying tactics;

e.      Interfering with the target's relationships with students by telling lies about the target to the students to discredit and humiliate the target;

f.      Encouraging students and support staff to harass and refuse to cooperate with the target, to make it nearly impossible for the target to do her job;

g.      Interfering with the target's ability to do her job, such as refusing to give keys to access necessary equipment, and taking equipment out of the classroom when it is needed; and

h.      Ignoring state law and TSU/TMSL policy manuals to

manipulate the distribution of taxpayer dollars to deny earned advancements, titles, pay increases, and other monies to Caucasians and females in violation of the Constitution and state law.

3.      Over the years, Caucasian and female law professors have complained about all of the above-referenced forms of harassment that combine to create an intensely hostile work environment and significantly affect the terms and conditions of employment, making it virtually impossible to get the job done. These other professors refer to the hostile work environment at the law school as "constant," "persistent," and "pervasive."

4.      As a Caucasian woman, Professor Sacks has been targeted for egregious, aggressive, physically threatening, constant harassment and bullying for years. She has been assaulted twice and put in apprehension of imminent harmful contact once, by three of the Individual Defendants named herein. . She has been subjected to false and absurd allegations of discrimination soon after lodging a discrimination complaint herself, and has spent hundreds of hours of her time over the years to disprove various absurd allegations. The Individual Defendants have acted under color of state law, and have abused committee processes and faculty voting procedures to harass Plaintiff and to deny her benefits she has earned.

5.      Employment benefits that non-white and male professors routinely enjoy are denied to Plaintiff, such as dean positions and director positions, large

sums of additional income, and reasonably qualified administrative and research assistants. The list of invasive, harassing, and abusive conduct perpetrated by TSU and TMSL administration and certain other professors is very long. The intensity and persistence of the harassment has affected the terms and conditions of her employment, and has resulted in very costly and tangible adverse employment decisions, costing Plaintiff hundreds of thousands in actual damages over the years.

6.     The individual defendants have also defamed Plaintiff to students and interfered with her relationships with her teaching assistants and research assistants, destroying those relationships and interfering with Plaintiff's productivity. Her students have approached her with concerns about TMSL administration sabotaging her teaching evaluations, which remain positive despite the ongoing attempts to manipulate the outcome. Plaintiff is routinely discredited, screamed at, and bullied on a constant basis, to the point that she avoids committee and faculty meetings. The individual defendants spend more time finding ways to harass Professor Sacks than they have ever spent on academic pursuits, hence their dismal or nonexistent records of scholarship.

7.     Professor Sacks's complaints of an intensely hostile work environment are similar to complaints of other female and/or white law professors who have filed EEOC charges of discrimination and lawsuits against TSU. In the past 10 years alone, female and/or white law professors have described the hostile

work environment at TMSL as "pervasive," with "hostile office rants" occurring on a "regular, almost daily basis" and that the "retaliation is beyond isolated."[1] Similarly, female dean Patricia Garrison described how the law school dean "embark[ed] on a campaign to make her life extremely difficult," "micromanaged every detail" of her job (despite the fact that she was a dean), refused to allow her the authority to do her job, withheld money earned and owed, refused to allow her to have a key to rooms she needed to access in the law school, and harassed Dean Garrison in a "varied and constant" manner.[2] Both of these other TMSL professors describe intense retaliation when they finally filed lawsuits, and Professor Sacks experienced similar harassing, discriminatory, and retaliatory treatment. TMSL makes it virtually impossible to work at the law school for those professors targeted for discrimination and harassment.  The American Bar Association has reprimanded TMSL for its "persistent non-compliance" with ABA standards concerning gender equity, and fined TMSL for the law school's failure to address sexual harassment and discrimination.

8.    Professor Sacks attempted to get relief from the ongoing, pervasive harassment by personally delivering to the university president (Austin Lane) and law school dean (at that time, James Douglas) on September 15, 2016, a detailed

---

[1] *See Jackson v. Texas Southern University*, 4:16-cv-01123 (S.D. Tex. 2011) (Document 17).
[2] *See Garrison v. Texas Southern University*, 2011 WL 4457374 (S.D. Tex. Sept. 21, 2011). *See* Plaintiff's Second Amended Complaint, *Patricia Garrison v. Texas Southern University*, Civil Action 4:11-cv-02368 (S.D. Tex. August 29, 2012) (Document 44).

letter of complaint with over 100 pages of exhibits to demonstrate the seriousness of the ongoing harassment. Defendant Douglas, in his official capacity of acting law school dean, TSU, and TMSL did absolutely nothing in response to her detailed complaint. The harassment and retaliatory conduct escalated after Professor Sacks notified TSU administration of the pervasive harassment, just as it did when other professors complained about similar harassment and abuse. After more than two years of waiting for TSU do take some reasonable measures to stop the horrific race and sex-based harassment, Professor Sacks had no option but to pursue a remedy in a court of law.

9.    The individual defendants have acted with malicious intent, racial hate, and misogyny. They have formed voting blocks to manipulate the committee processes and the distribution of taxpayer dollars, acting under color of state law, to divert funds away from deserving Caucasians. They have blatantly rejected meritorious Caucasian candidates for lucrative perks of employment while giving those perks to black professors. They also act out of sheer hatred for whites, and have referred to whites as "white bitch," "fucking whites" and "fucking white people" on a regular basis.

10.    On information, Texas legislator James Dutton is friends with James Douglas, and they both share hostility towards Caucasians. Dutton's Chief of Staff, Tamoria Jones, who was a law student at TMSL at the time, wrote on Facebook:

**"lmao!!! You know I got go out with a BANG!!! I'm not letting these whites make it …[shouting icon] they gonna [sic] respect the Negroes of the TMSL."** *See* **Exhibit A.** On information, Dutton applauded her later for "standing up to white people," and the law school later featured Jones in its law school magazine. Jones's sentiment, posted on Facebook, accurately reflects the attitude of hostility toward whites that permeates the law school.

11. For example, Defendant Colon promotes his anti-Trump and anti-white political agenda during class time. Colon refers to whites as "fucking white people," and seeks to force plaintiff out of the law school based on racial animus. He and the other Individual Defendants share a common goal to subvert equal protection, due process, and TSU policy manuals under color of state law to deny Caucasians and females just compensation. On information, Defendant Colon has received additional income that TSU has failed to report as required by law, as have other male professors at the law school.

12. All of the many and varied forms of harassment Professor Sacks complains of herein are recognized as *typical* among experts in academic harassment and bullying. Experts refer to the constant, ongoing harassment that Professor Sacks describes as "disruptive and obstructive" tactics, intended to interfere with the target's productivity, emotional well-being, and scholarly success. Subverting university processes such as voting on committees for titles,

sabbaticals, and other perks of employment that are supposed to be merit-based is a well-known phenomenon among experts in academic harassment. Women are routinely targeted for academic bullying and harassment, as are minorities. In this case, Professor Sacks is both a woman and a minority.

13.     TMSL boasts of diversity and inclusion, but Professor Sacks has been shown the opposite, along with other female and white professors who have also been targeted for harassment and discrimination. The university and its faculty have no excuse for gender and racial bias.

## II.     PARTIES

14.     Plaintiff Deana Pollard Sacks is a Caucasian women residing in Houston, Harris County, Texas. Professor Sacks has devoted the last eighteen years of her life to the development of Texas Southern University's Thurgood Marshall School of Law ("TMSL"). Currently she is a full, tenured professor of law.

15.     Defendant Texas Southern University ("TSU") is a coeducational statewide general purpose institution of higher education located in Houston, Harris County, Texas. TSU controls and operates TMSL. It has been served and has made an appearance in this case.

16.     Defendant Ahunanya Anga (hereinafter "Anga") is a Professor of Law at TMSL. Defendant Anga is being sued in her personal capacity only. Defendant

Anga has been served and has made an appearance in this case. Anga has shouted Professor Sacks down in faculty meetings, used her position on a law school committee to falsely accuse Sacks of discrimination, and physically confronted Sacks in the law school parking lot and charged at Plaintiff and shouted in Plaintiff's face while blocking Plaintiff from parking in her 24/7 reserved space, for which Plaintiff paid approximately $450.00 per year. Anga also made bizarre, derogatory, invasive, and false statements about Plaintiff's health as she refused to move her car from Plaintiff's parking space, forcing Plaintiff to be late to class. Anga is from Nigeria and has demonstrated open and obvious anger toward Sacks and other white professors in the law school for years.

17.     Defendant James Douglas is Distinguished Professor of Law at TMSL. Defendant Douglas is being sued in his <u>personal and official capacities</u>. Defendant Douglas has been served and has made an appearance in this case.

18.     Defendant Fernando Colon-Navarro (hereinafter "Colon") is Professor of Law and Director of L.L.M. & Immigration Development at TMSL. Defendant Colon is being sued in his personal capacity only. Defendant Colon has been served and has made an appearance in this case. Colon routinely misuses his class time for personal, political purposes, and goes on political "tirades" during class time on a regular basis, constantly bashing Donald Trump as "racist," and referring to Caucasians as "fucking whites" and "fucking white people."

19.     Defendant Ana Otero (hereinafter "Otero") is Professor of Law at TMSL. Defendant Otero is being sued in her personal capacity only. Defendant Otero has been served and has made an appearance in this case. Otero physically assaulted Professor Sacks by slamming a door into her body and has badgered Professor Sacks consistently for many years, including interfering with Professor Sacks's relationships with her students and assistants, abusing her position in committees to make false allegations against Professor Sacks, and demonstrating open and obvious hostility toward Professor Sacks at every turn. Otero also used classtime with first year law students to promote her political agenda and demonstrated visible and vocal animosity toward whites.

20.     Defendant April Walker is Professor of Law at TMSL. Defendant Walker is being sued in her personal capacity only. Defendant Walker has been served and has made an appearance in this case. It is commonly known that Walker was Douglas's girlfriend for some time, and is "immune" from consequences for her outrageous, abusive, loud and offensive outbursts in the law school on account of her sexual relationship with Douglas, who wields great power at TSU as the former president and law school dean. She has been known to use the phrase "white bitch" and has accused Professor Sacks of getting ahead only because she is white. Walker physically assaulted Professor Sacks in the law school and made physical contact with her body, got into Sacks's face and yelled at her in front of

one of Sacks's top students in the law school hallway, and has demonstrated open and obvious hostility toward Sacks and other white professors in the law school for years. In the spring of 2017, Walker obtained Plaintiff's cell phone in the law school and took it into her office, without Plaintiff's knowledge or consent, such that Plaintiff could not find it, depriving Plaintiff of the use of her cell phone for a significant period of time, until Plaintiff traced the exact location of her cell phone with another cell phone, using the Find My iPhone application.

21.    Defendants Anga, Colon, Otero, and Walker (collectively, "Individual Defendants") are, or were during relevant times herein, administrators, directors, or professors of Texas Southern University and/or the Thurgood Marshall School of Law. The Individual Defendants acted in concert to further their malicious, misogynist and racist agenda. They engaged in hostile, discriminatory, harassing, very invasive, highly offensive, and/or physically aggressive misconduct in their personal capacities under color of state law. These Individual Defendants are sued in their personal capacities for self-interested, discriminatory and tortious misconduct and are jointly and severally liable therefor, based on a concert of action.

22.    Defendant Douglas is sued both in his personal and official capacities. Douglas became the interim dean for TMSL around September, 2016. Douglas has a long history of discriminatory behavior toward whites. Douglas returned to the

law school with the intent of forcing white professors out of the law school, revoking their titled positions and giving such positions to far less qualified black professors, and working hard to maintain his personal control over the law school. He is known to hire and consort with other racists and to hire puppets and "yes-men" and "yes-women" to further his racist, anti-Caucasian agenda.

23.     In September of 2016, Plaintiff sought Douglas's help in remedying the pervasive harassment and discrimination, and Plaintiff provided Douglas with a detailed complaint concerning the ongoing race and sex harassment and discrimination on September 15, 2016. Despite having actual or constructive knowledge, Douglas did nothing to remedy or even investigate the harassment and discrimination, subjecting TSU to liability for failing to take reasonable corrective action as required to avoid Title VII liability. The right to be free from race and sex harassment and discrimination is a clearly established right, and Defendant Douglas had knowledge that Plaintiff's rights were being violated. Indeed, Douglas is well-aware of the prohibitions against race and gender discrimination, as he has been a law school dean and university president at Texas Southern University, a HBCU. In addition, Douglas was a defendant in a prior race discrimination lawsuit, and he was assessed $81,000.00 in punitive damages and $55,967.00 in compensatory damages in that lawsuit.[3] Douglas has knowledge of the many race

---

[3] *See Harrington v. Harris et al.*, 118 F.3d 359, 364 (5th Cir. 1997).

and sex EEOC charges and lawsuits that have been filed against the law school and the university over the past few decades.

24.     TSU is liable for all of its employees' discrimination, harassment, and retaliation that have created an intensely hostile work environment and resultant loss of tangible job benefits for Plaintiff over the years. TSU and TMSL top administrators and supervisors were provided with actual notice in September of 2016 of Plaintiff's serious claims, and chose to ignore them and do nothing about them for more than two years, whereupon Plaintiff filed the instant lawsuit after properly exhausting administrative remedies.

## III.   JURISDICTION AND VENUE

25.     This is a district of proper venue. Plaintiff is employed by TSU in Harris County, Texas, and many of the discriminatory acts occurred there. TSU has its headquarters and management in Harris County, Texas.

26.     Venue is proper in this district under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas. Venue in Harris County is provided by the Texas Education Code, Section 106.38.

27.     This case is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, 42 U.S.C. § 1983, 29 U.S.C. Section 206(d)(1), the Equal Pay Act, 29 U.S.C. § 1620, and Texas

common law. This Court has jurisdiction concerning the federal claims pursuant to 28 U.S.C. § 1331.

## IV.    STATEMENT OF FACTS

### A.    <u>TMSL's history of discrimination in contravention of TSU's mission.</u>

28.    The Thurgood Marshall School of Law (TMSL) at TSU was established in 1946 by the Texas Legislature to sustain the segregationist policies that permeated Texas' higher-education system. The law school's Mission Statement provides that the law school's purpose is "to expand opportunities for the underserved in the legal profession . . . with special emphasis on a historically black heritage and tradition." Instead of furthering its mission, the law school has hired administrators and professors who are unqualified, racist, sexist, and counterproductive to the law students' education and the law school's mission. The students at TMSL do not receive consistent quality instruction as a result, and the law school mission is undermined.

29.    The law school administration regularly fails to follow established law, industry-wide standards, and its own written policies. The law school regularly fails to make merit-based employment, promotion, and compensation decisions, and allows and ratifies racial and gender discrimination, harassment, and retaliation against persons who complain. The law school pays higher compensation and provides much better conditions of employment for male and

non-white employees to the detriment of faculty morale, the law students, the law school's reputation, and the law school's mission.

30.     The law school is a hotbed of racial and gender discrimination and harassment, creating a hostile and dysfunctional educational and employment environment. There is pronounced anti-white sentiment among many of the professors who are TMSL graduates, and certain other non-white professors, and the law school and TSU administration regularly allows and ratifies blatant and audacious discrimination and harassment perpetrated by TMSL law professors against Caucasians. The law students sometimes take part in creating a very hostile anti-white racist environment, following the lead of the TMSL professors and administrators. Dozens of EEOC Charges of Discrimination and discrimination lawsuits have been filed against TSU and/or TMSL administrators.

31.     Defendant James Douglas graduated from TMSL and joined the TMSL faculty in 1971. Douglas has been the TSU President and the TMSL Dean. Over the course of nearly a half century, Texas taxpayers have paid millions of dollars to Douglas as he has created a university-wide culture of sexism, racism and harassment. Douglas has acted with malicious intent and in concert with other racists and misogynists.

32.     In 1993, while Defendant James Douglas was the dean of the law school, white professors sued Douglas and the law school for intentional racial

discrimination. The jury found that Douglas's conduct was intentional or malicious, warranting an award of punitive damages to punish Douglas in the amount of $81,000.00. The Fifth Circuit affirmed the judgment, and the United States Supreme Court declined to grant review. On information, TSU paid the punitive damages award, meaning that Texas taxpayers ultimately paid for Douglas's intentional, racist misconduct. Douglas remains an influential figure at TSU and persists in perpetrating a culture of racism and sexism. In 2015, Douglas returned to teach at TMSL after spending years in upper administration. Douglas became the interim dean of the law school from about September, 2016 to September, 2017. Texas taxpayers have paid Douglas's salary of around $200,000.00 – 500,000.00 per year for decades as he has carried out his anti-white racist agenda at TSU and the Thurgood Marshall School of Law.

33.     Many of the EEOC Charges filed against the law school in the past ten years have been based on sexual harassment or sex-based discrimination and retaliation. Female professors are given more difficult or undesirable course schedules and are paid less than male professors. Male professors are given deanships, directorships, or professorships with substantial increased compensation of $20,000.00 to $40,000.00 or more per year, while females are generally passed over. Female professors and deans have described the harassment at TMSL as persistent, "daily," intentional, concerted, "pervasive," physically aggressive, and

malicious, which creates a very sexist, hostile work environment and a profoundly unprofessional atmosphere in the law school.

34.     In 2016-2017, the ABA issued censures against TMSL for violations of gender anti-discrimination accreditation standards as well as academic standards. In June, 2017, while Defendant James Douglas was the interim dean of the law school, the ABA issued to the law school a written Notice of Censure and Directed Specific Remedial Action (ABA Notice of Censure).[4] In the ABA Notice of Censure, the law school was ordered to pay a fine of $15,000.00 for its substantial and persistent non-compliance with ABA standards prohibiting gender discrimination and sexual harassment. The ABA also required the law school to post a notice on the law school's website concerning the school's ongoing gender discrimination. The ABA directed the law school to remedy the unequal pay based on gender. Despite facing possible revocation of ABA accreditation, Defendant Douglas, while acting as interim dean of the law school, announced in a faculty meeting that he decided that there was no problem with gender discrimination. The law school has taken no reasonable steps to equalize the salaries of the professors, despite the ABA's specific directive to take immediate steps to equalize salaries.

---

[4] *See* ABA Journal, "Texas Southern's law school receives ABA public censure after sex discrimination allegations", July 20, 2017, *available at* http://www.abajournal.com/news/article/texas_southerns_law_school_receives_aba_public_censure_involving_equal_oppo).

35.     The ABA requires a bar passage rate of at least 75% to maintain accreditation. TMSL consistently has the lowest bar passage rate in Texas, a rate of 40% for first time bar examinees from the February 2017 bar exam, 64% for the July, 2017 bar exam, 28% for the February, 2018 bar exam, and 44.5% for the July, 2018 bar exam. The pass rates of TMSL repeat bar takers were even lower, as low as 22.8% for the February, 2018 bar exam, and 23.5% for the February, 2017 bar exam. Previously, Pat Garrison, a Caucasian female, was hired to help with TMSL's bar passage rate and the rate quickly went up to over 75%, whereupon Garrison was subjected to intense harassment and forced out of her job, and sued TSU for race discrimination.[5] The bar passage rate for TMSL graduates plummeted thereafter.

36.     The TMSL students suffer horribly as a result of the law school's discriminatory practices and very hostile environment. The low bar passage rate is entirely avoidable, and exists as a result of corruption, discrimination in admissions and hiring, and failure to follow industry-wide standards in many respects, including hiring unqualified professors. For example, TMSL faculty members largely fail to conduct law school examinations in accordance with the standards and practices of the legal academy. Instead of testing by means of essay exams per industry standard, most TMSL professors test exclusively by multiple-choice

---

[5] *See* Plaintiff's Second Amended Complaint, *Patricia Garrison v. Texas Southern University*, Civil Action 4:11-cv-02368 (S.D. Tex. August 29, 2012) (Document 44).

exams, some of which are obtained from commercial outlines in the TMSL library, and most of which are re-used year after year, creating fertile ground for cheating. The students are not provided the opportunity to have their legal analysis reviewed carefully, and corrected as necessary, because they are not given essay exams and the professors have no window into the law students' thought processes, and no opportunity to correct faulty legal analysis in the early stages of the students' law school career. Failing to examine students by essay exams is much easier for the law professors. Grading essay exams is extremely time-consuming, while grading multiple-choice exams consists of running scantrons through a machine in a matter of seconds. Some of the law professors are not capable of drafting and grading law school examinations because they do not understand the law sufficiently well to teach it, draft quality examinations, or grade essay examinations. The law school examination process alone undermines the mission of the law school and fails to prepare the students for the bar exam. Meanwhile, certain law professors blame the students for the low bar passage rate as these professors refuse to conduct proper essay exam testing or to develop an expertise in the area of law for which they are paid hundreds of thousands of dollars to know and teach.

37.    In 2017, the ABA demanded copies of all law school exams from all professors for the past five years. Plaintiff responded immediately with an organized set of all exams, but some TMSL professors refused to release their

exams, likely because they were made up of multiple-choice questions obtained from commercial books and outlines, and used repeatedly over the years with no modifications.

38.     Texas taxpayers are paying millions of dollars every year for the salaries and other benefits of employment provided to certain TMSL professors and administrators who are unqualified, cannot answer simple questions in the subjects that they teach, and are unable to help the law students or further the mission of the law. Many administrative decisions at TMSL are based on race and/or gender, violate state funding statutes and anti-discrimination laws, violate TSU and TMSL policies and faculty manuals, grossly misappropriate public monies, and are ultra vires.

### B.     Plaintiff's exceptional qualifications and work ethic

39.     In 2000, Plaintiff Deana Pollard Sacks was hired by TMSL as an assistant professor of law. Plaintiff is among the most qualified and effective teachers and scholars at the law school. Plaintiff was in the top 10% of her law school classes at U.S.C. (J.D.) and U.C. Berkeley (LL.M.). Plaintiff published a paper in Vanderbilt Law Review (a top 20 journal) that she wrote while a student at U.S.C. Plaintiff studied critical race theory and discrimination at Berkeley, published a highly respected and much-cited thesis in the Washington Law Review (a top 25-30 law review) on unconscious racial bias as part of her LL.M. program,

has an expertise in implicit bias and discrimination, and is dedicated to the mission of the law school. Plaintiff provides her personal cell phone to her students so that they may reach her at night and on the weekends. Plaintiff has opened her home to students for review sessions, and has held extra review sessions for her students, without compensation, to help the students. Plaintiff has received very good teaching evaluations over the course of 18 years.

40.     From 2000 to the present, Plaintiff taught tort law, demonstrated an extraordinary work ethic, consistently published academic articles in very prestigious law journals, received good teaching evaluations, and served the public in numerous ways, including providing pro bono legal services to persons who could not afford a lawyer. Plaintiff has written and graded torts essay examinations since 2000 and regularly meets with students for a one-on-one review of their torts essay exams and an analysis of their legal writing skills. Plaintiff has developed an expertise in tort law through tenacious study and research, and has written torts essay exams and model answers for the California State Bar, as well as multiple-choice questions and answers, at the request of the California State Bar. Plaintiff received tenure in 2006, and was promoted to full professor in 2008.

41.     Plaintiff has published numerous law review articles that have received extraordinary scholarly recognition. Plaintiff has been recognized as in the top 10% of scholars in the Social Science Research Network, a worldwide,

multidisciplinary scholarly network. She has received numerous congratulatory notices from Research Gate that she had the "most read contributions from your department" in that period, i.e., Plaintiff's work is being utilized by other professors, courts and legislatures at a very high level.

42.    Plaintiff's scholarship has been cited by the United States Supreme Court, the Sixth Circuit, state supreme courts, and numerous other courts, legislators, and famous scholars.  Plaintiff's published scholarship has landed her an offer to publish a book with professors from Harvard and an invitation to speak at Harvard Law School. Plaintiff has appeared on CSPAN, the Fox News Channel, The New England Cable News Network, and several other broadcast stations as a result of her published work. Plaintiff is among the most qualified professors at TMSL and has achieved extraordinary industry-wide scholarly recognition for a TMSL professor.

### C.    TMSL's unequal pay practices and pervasive discrimination

43.    Plaintiff has been subjected to unfair work conditions and unequal compensation because she is female and Caucasian. The unequal pay and unfair working conditions were motivated by misogyny and racism, and but for Plaintiff's gender and race, she would not have been subjected to such unfair and unlawful treatment. Plaintiff's base salary and total compensation are less than that of other law school professors who are black and/or male. The black and/or male professors

make significantly more money than Plaintiff despite having inferior academic credentials and despite inferior performance as law professors, based on objective criteria, industry standards, TSU and TMSL policy manual provisions, and professional recognition in the legal academy and at large. A complete salary analysis will be presented at trial. To provide a few examples:[6]

a.   Edieth Wu. Professor Wu is a black female who became a tenure-track law professor the same year as Plaintiff (2000). Wu attended TSU law school for her J.D. and University of Houston for her LL.M., while Plaintiff attended U.S.C. (a top 20 law school) on a merit scholarship for her J.D. and U.C. Berkeley (a top 10-12 law school) for her LL.M., and Plaintiff graduated in the top 10% or higher from both schools. Plaintiff has numerous law review articles in top 20 law reviews, while Professor Wu has not even a single top 50 law review article published, and Plaintiff's scholarship record and scholarly impact are vastly superior to those of Professor Wu. Yet, Professor Wu had been given raises such that by 2008, she had a base salary of more than $8,000.00 per year than Plaintiff, and currently has a total compensation of approximately $25,000.00 – 30,000.00 per year above Plaintiff.

---

[6] Pay disparity information is based on published data provided by TSU. On information, some data is incorrect, and some compensation paid to persons other than Plaintiff is not being reported.

b.      Lupe Salinas. Professor Salinas is a male who received a J.D. from University of Houston, and does not have an LL.M. Professor Salinas joined the faculty on tenure-track one year after Plaintiff and he has no top 20 or even top 50 law review articles published. Plaintiff's scholarship record and teaching evaluations are vastly superior to those of Professor Salinas, who was removed from the first year curriculum due to so many complaints about his inability to teach and lack of subject matter knowledge. And yet, Professor Salinas started with a base salary approximately $20,000.00 higher than Plaintiff's base salary, and has received hundreds of thousands of dollars more than Plaintiff over the past 15 years, despite far inferior credentials, teaching, and scholarship.

c.      Manual Leal. Professor Leal is a male who has a J.D. from South Texas College of Law and an LL.M. from N.Y.U. He joined the TSU law faculty four years after Plaintiff. Professor Sacks has published far more than Professor Leal, who has no top 50 law review articles published. Professor Leal started with a base salary approximately $20,000.00 higher than Plaintiff. By 2016, Professor Leal's base salary was 23,000.00 higher than Plaintiff's base salary. Over the past 15 years, Professor Leal has received hundreds of thousands of dollars more in compensation than Plaintiff.

d.      Okezie Chukwumerije. Professor Chukwumerije is a black male who has law degrees from Nigeria and Canada, and joined the faculty a few years after Plaintiff. Professor Chukwumerije's base salary is within approximately $1000.00 of Plaintiff's base salary. Professor Chukwumerije has a few publications, none of which are top 50 law review articles, and yet, he receives an additional $20,000.00 per year as a titled professor, while Plaintiff was denied a title.

e.      Gabriel Aitsebaomo. Professor Aitsebaomo is a black male who has a J.D. from TSU and an LL.M. from University of Florida. He joined the faculty a few years after Plaintiff, and yet in 2016 TSU reported that his base salary is within about $1000.00 of Plaintiff's base salary. Professor Aitsebaomo also was offered a dean position early on, and has been making approximately $40,000.00 – 45,000.00 more than Plaintiff for years, i.e., hundreds of thousands of dollars more than Plaintiff over the past decade, with lesser credentials and a scant publication record in low-ranking journals, while Plaintiff has consistently published in top 20 to top 50 law reviews and has been denied a dean position and a director position.

f.      Larry Weeden. Professor Weeden is a black male who has a J.D. from Mississippi and no LL.M. He joined the faculty 10 years before Plaintiff. Professor Weeden has no top 20 law review articles, and most of

his publications are in bottom-tier law journals. Yet, Plaintiff's base salary is approximately $32,000.00 lower than Professor Weeden's base salary. Professor Weeden has a title, for an additional $20,000.00 per year. Professor Weeden was offered a dean position in or about 2018, and his current compensation is approximately $90,000.00 - 100,000.00 higher per year than Plaintiff's compensation.

g.     Docia Rudley. Docia Rudley is a black female who joined the faculty after the Plaintiff and has no or virtually no published scholarship. She did not receive tenure and her employment was set for termination. Then, her husband became the President of Texas Southern University and Professor Rudley was retained and given a pay increase such that her salary exceeded the Plaintiff's salary, despite the fact that Plaintiff had earned tenure. McKen Carrington was responsible for Professor Rudley's pay increase, in or about 2008, to provide Professor Rudley with a base pay of approximately $2,000.00 more than the Plaintiff. Meanwhile, TSU paid her husband more than $400,000.00 as the university president despite his aggressive and discriminatory treatment of other female law professors.

| Comparator | Race | Gender | Start Date | Degrees | Pay Disparity | Total Pay Disparity |
|---|---|---|---|---|---|---|
| Edith Wu | B | F | 2000 | TSU (JD); UH (LLM) | $8,000 (Base) | $28,000 |
| Lupe Salinas | H | M | 2001 | UH (JD) | $20,000 (Base) | $20,000 |
| Manual Leal | H | M | 2004 | STCL (JD); NYU (LLM) | $20,000 (Base) | $20,000 |
| Okezie Chukwumerije | B | M | 2003 | Nigeria; Canada | $-1,000 (Base) | $19,000 |
| Gabriel Aitsebaomo | B | M | 2004 | TSU (JD); Florida (LLM) | $-1,000 (Base) | $42,000 |
| Larry Weeden | B | M | 1990 | Miss. (JD) | $32,000 (Base) | $93,000 |
| Docia Rudley | B | F | ~ 2002 | U. Washington (JD) | $2,000 (Base) | $2,000 |

The disparity in compensation is race-based and gender-based and contrary to merit or any objective criteria. The disparity violates Title VII, the Equal Pay Act, and other clearly-established state and federal law.

44.    In addition, the state funding statutes and TSU and TMSL faculty manuals set forth specific merit-based criteria for the purpose of avoiding arbitrary and capricious compensation decisions, and to comply with due process. The provisions contained in the state statutes and faculty manuals are consistent with longstanding, industry-wide standards and professors' expectations of fair and merit-based compensation for superior scholarly performance in the legal academy. The Defendants have repeatedly and blatantly disregarded the objective criteria contained in the TSU and TMSL faculty manuals, and have awarded compensation based on race, gender, and/or sexual liaisons, as opposed to the

merit-based criteria set forth in the faculty manuals and required by law. For example, soon after law professor Docia Rudley's employment was set for termination due to a lack of scholarly achievement, her husband became the TSU President, and Rudley was retained by the law school and given a raise such that her base salary exceeded the Plaintiff's base salary, despite the fact that Plaintiff achieved tenure.

45.    After Douglas returned to teach and administer the law school, Plaintiff suffered increased adverse employment decisions resulting in significant lost compensation, including revocation of her title. Plaintiff has also been subjected to intense harassment.

### D.    <u>**Hostile work environment & continuing violations**</u>

46.    The law school environment is intensely hostile, and the hostile environment is grounded in racial and gender animus. On many occasions, Plaintiff has been screamed at, falsely accused of misconduct, physically hit or shoved, assaulted, and slandered by certain non-white or male employees at the law school. The harassment has interfered with Plaintiff's work, distracted her from her job performance, impeded her professional advancement and publication record, and caused her to feel intimidated and threatened by the very loud, aggressive, and physically threatening behavior of the defendants. Defendants' harassment and other unlawful treatment of Plaintiff was motivated by racial and gender animus,

and but for Plaintiff's race and gender, she would not have been subjected to such unfair and unlawful treatment. Any reasonable person would find the constant, daily, egregious harassment physically threatening and intimidating and an unreasonable interference with Plaintiff's work performance, and plaintiff subjectively feels this way.

47.     Indeed, the entire university is polluted with discrimination aimed at women and whites, to the point that many TSU employees, in various departments, have suffered psychological and psychiatric injuries, and have filed EEOC claims and discrimination lawsuits. The discriminatory and intensely harassing and abusive environment at TSU and TMLS has been extensive, long-lasting, unredressed for many years (a subject of the ABA investigation), and uninhibited. TSU administrators believe that they are untouchable, and they have largely gotten away with intentional, abusive, malicious violations of employees' constitutional and statutory rights, for decades, despite being sued on a regular basis.

48.     Some of the ongoing and continuous acts of harassment occurred less than 300 days before Plaintiff filed her EEOC Charge of Discrimination on February 1, 2017 or Amended Charge of Discrimination on May 11, 2018. A few examples of the daily, ongoing incidents of harassment include:

a.     Defendants Ana Otero and April Walker (a TMLS graduate) are friends and have repeatedly attempted to interfere with Plaintiff's career by,

*inter alia*, voting against her for tenure and promotions based on racial animus as opposed to merit, making false accusations against Plaintiff, screaming at plaintiff, soliciting help from students to harass Plaintiff and interfere with her job, and physically aggressing against Plaintiff, including slamming a door into Plaintiff's body, punching a handbag off of Plaintiff's shoulder, and grabbing Plaintiff's arm. Soon after Otero slammed a door into Plaintiff, she stormed into the dean's office yelling and gesturing toward Plaintiff. Plaintiff moved behind Dean Holley who was standing at the doorway to his office, watching Otero. Plaintiff moved behind Holley and into his office, to block Otero's access to her. Otero then attempted to pass by Dean Holley, who did not allow her to pass by, and told her that he would speak to her after speaking with the Plaintiff. Soon thereafter, Plaintiff heard Walker in Otero's office (which is near Plaintiff's office) loudly saying, "Who does Pollard think she is)?" in a loud and aggressive tone. Walker said these same words to Plaintiff in the law school hallway when she confronted Plaintiff and made a scene on another occasion, in front of one of the law school's top students. On numerous occasions, Plaintiff saw Otero and Walker together, and their behavior toward Plaintiff was similar, aggressive, threatening, and harassing.

b.      Defendants Walker and Colon have repeatedly made racist or other inappropriate statements manifesting hostility toward white people, women, and/or Plaintiff in particular. Defendant Walker is known to use the phrase "white bitch" when referring to white women, is known for loud, unprofessional outbursts in the law school, and has screamed racial comments in the law school, including the statement, "What's so special about her (pointing at Plaintiff), because she's white?!" For years, Defendant Colon had a sign on his office door that said, "Parking for Puerto Ricans Only," and has referred to Caucasians as "fucking whites" at the law school, in front of students.  Defendant Colon, a married man, has presented a photograph of an attractive pole dancer (stripper) to persons in the law school, makes people feel very uncomfortable by constantly discussing students' and other women's bodies and telling everyone how "good looking" he was as a younger man. All of this conduct was unwelcomed and caused Plaintiff to feel very uncomfortable.

c.      In the summer of 2016, soon after Plaintiff made a race-based complaint concerning her title revocation, Defendants Otero, Anga, and Walker, along with Otero's student assistant, voted to recommend a finding of discrimination against Plaintiff as committee members of the Academic Standards Committee, of which Otero was the chair. There was no evidence

to support the recommendation, and the dean at that time, Dan Holley, did not support the committee's bogus recommendation, because there was "no evidence" to support a finding that Plaintiff had discriminated against anyone. Still, the proceeding was very distressing and cost Plaintiff many hours defending herself in the kangaroo proceeding.

d.      Defendants Anga (a TMSL graduate) and Colon have repeatedly screamed at Plaintiff in faculty meetings and raised their voices over Plaintiff when Plaintiff tried to contribute to faculty discussions. Colon has tested his students by multiple choice exams for more than twenty-five years and knows that Plaintiff believes that essay exam testing is necessary to benefit the TMSL students. Because she is a Caucasian woman with excellent academic and scholarly achievements, Defendant Colon has made numerous false and derogatory statements about Plaintiff to numerous students in an attempt to discredit Plaintiff, including a false statement that Plaintiff was fired from a prior teaching position. Students have reported that Colon constantly brings up Plaintiff during his property class and constantly makes derogatory remarks about Plaintiff.

e.      McKen Carrington, former dean of the law school, and Darnel Weeden, former associate dean of the law school, have repeatedly taken action to deprive Plaintiff of her employment benefits and fair

compensation. Both have interfered with the sabbatical process for the purpose of depriving Plaintiff of benefits of employment. McKen Carrington has yelled at Plaintiff repeatedly, and numerous EEOC charges have been lodged against McKen Carrington, a recognized misogynist.

49.    Cumulatively, the many ongoing acts of harassment have created a very hostile work environment based on race and gender. The harassment has been continuing and has been perpetrated by the Defendants in a concerted, organized and intentional fashion. The harassment is grounded in gender and racial animus, and permeates every aspect of the employment setting, making it very difficult for Plaintiff to do her job, and making it impossible for Plaintiff to perform at her highest level, harming the TMSL students and the law school mission in the process.

50.    The Defendants' harassing conduct has forced Plaintiff to spend hundreds of hours over the course of eighteen years defending herself against false charges, documenting other employees' harassment, obtaining witness statements, and interfacing with TSU Human Resources and the law school administration to seek relief from the ongoing harassment. Human Resources has refused to conduct a reasonable investigation or to take remedial action despite repeated complaints. Instead, Human Resources summarily supports the harassing parties based on racial bias or gender bias and TSU harassment-encouraging policies.

51.     Other Caucasian and female professors have suffered discrimination and harassment as well.   Many EEOC charges have been filed against Texas Southern University and the Thurgood Marshall School of Law. The Human Resources Department at Texas Southern University is well-aware of the racial and gender-based discrimination and harassment, but has never undertaken a serious investigation into such systemic discrimination and harassment or engaged any corrective action, despite receiving many complaints. Another white professor at TSU received a death threat from a student, and TSU did nothing about it for many months, causing the professor to feel very concerned for his physical safety.

### E.     Adverse employment decisions resulting from hostile work environment

52.     Plaintiff has repeatedly requested an administrative position, additional responsibilities relative to preparing the students to take the bar exam, or a directorship with the law school. These positions and responsibilities come with enhanced compensation and prestige in the academic community. Despite being well-qualified, all of Plaintiff's requests have been denied or ignored. At the same time, the law school has promoted numerous non-white professors, male and female, to dean positions or director positions, with significant additional salary. Despite Plaintiff's repeated requests to help with bar preparation, the law school refused to allow Plaintiff to help and instead provided additional compensation for

non-white and male professors to conduct bar review classes, despite the fact that some were unqualified to teach the bar review classes.

53.     Titled professorships and chaired positions are provided to professors who demonstrate extraordinary scholarship and receive scholarly recognition in the academies. Titled professorships are distributed based predominantly as a reward for published work and scholarly recognition, based on state law, official TSU and TMSL policies, and industry-wide customs, rules, and standards. The TSU and TMSL faculty manuals and other documents set forth specific standards for awards of titled professorships, focusing on the quality of scholarship and objective criteria for measuring the quality of scholarship, such as rank of the publishing journal and the number courts and legislatures that have cited the professor's published work. The specific standards are set forth in the faculty manuals to avoid arbitrary or capricious awards of titled professorships and to assure that the lucrative titles are awarded based on merit, to comport with due process, and to avoid arbitrary, discriminatory, and non-meritorious awards of taxpayer dollars. Plaintiff had a reasonable expectation of a title, increased compensation, and retention of her title, based on her extraordinary work ethic and prestigious publication record.

54.     In 2011, Plaintiff was awarded the Roberson King Professor of Law title, effective 2011-2015. Soon thereafter, the harassment perpetrated by

Defendants Walker and Otero intensified, and both Defendants screamed at Plaintiff and physically aggressed against Plaintiff, both making aggressive physical contact with Plaintiff's body.

55.     Plaintiff formally complained about Defendants Walker and Otero to Human Resources and provided Human Resources with a list of witnesses who witnessed some of the harassment. Plaintiff provided Human Resources with a detailed statement by a percipient witness, but Human Resources did not conduct a reasonable investigation or contact critical witnesses, and instead denied Plaintiff's allegations or passed the matter back to the law school, taking no reasonable corrective action.

56.     As a result of the harassment perpetrated by Defendants Walker and Otero, among others, and Plaintiff's concern for her physical safety, Plaintiff pursued her scholarship and produced an educational talk show away from the law school between 2013 and 2014, which caused her to lose approximately $100,000.00 in compensation and benefits.  In addition, TSU did not pay Plaintiff her Roberson King title funds in 2014 in the amount of $20,000.00 despite the fact that Plaintiff produced academic scholarship during that period. Plaintiff published an article in American Psychologist, the official peer-reviewed academic journal of the American Psychological Association. The American Psychologist is a highly respected top tier academic journal with a very broad circulation. *See Supreme*

*Court Decision on Violent Video Games Was Based on the First Amendment, Not Scientific Evidence,* AMERICAN PSYCHOLOGIST, with Brad Bushman (April, 2014). Plaintiff also wrote, produced, and directed seven educational programs, which gave credit to TSU and the Roberson King title. (*See* www.meettheprofessors.org for the educational programs). These educational programs for the public included world renowned guests discussing subjects critical to society. Plaintiff fronted her own money to produce the programs, expecting to be reimbursed by the Roberson King title funds.[7] However, TSU refused to pay Plaintiff the Roberson King title funds. Plaintiff spoke to Dean Holley about the unpaid funds in April, 2017, and Dean Holley explained that the procedure to claim the funds was to write a claim letter. Plaintiff made a request for the unpaid Roberson King funds to Dean Holley as per his instructions in response to Plaintiff's complaint about non-payment on April 17, 2016. Plaintiff waited to be paid, and expected to be paid, but in the end, the claim letter was ignored. Another white professor did not receive his title funds, although the black professors have consistently received their title funds despite producing far less scholarship.

57.     TMSL has a pattern of not paying white employees monies earned, forcing them to jump through hoops to get paid, or refusing to pay them altogether, and have similarly denied monies owed to Pat Garrison and Walt Champion, both

---

[7] No other professor has used title funds to produce educational programs for the public. Plaintiff did so and then TSU reneged on the deal and refused to pay Plaintiff the Roberson King title funds.

of whom are Caucasian. Despite receiving the Roberson King title, due to the misconduct of the Defendants and TSU/TMSL's failure to respond or to take corrective action for the numerous harassing actions against her, Plaintiff suffered a net loss in employment compensation during the period that she held the Roberson King title.

58.     In or about 2015, Defendant James Douglas returned to teach at the law school, and Plaintiff was subjected to very hostile treatment. Plaintiff's Roberson King title was revoked because she is Caucasian, in contradiction of the specific criteria and substantive and procedural due process requirements set forth in the faculty manuals, and in violation of clearly-established state and federal law, which require merit-based, non-racial decisions. A sham faculty vote was held near the holidays, on a date on which many professors were absent, but professors with TMSL law degrees were present. Three titles were available, and there were four black applicants and two white applicants. Plaintiff's application was complete and she met the criteria specified in the faculty manuals far more than other applicants. The other applicants did not provide important objective data concerning the quality of their scholarship, as requested as part of the official application process, because the data, including the low rank of the journals that published their work and the lack of citations by courts and legislatures, proved that their scholarship was objectively not of a high quality, rendering them unworthy of a title.

However, the portion of the faculty at the meeting voted to give all three titles to black professors with inferior scholarship and incomplete/insufficient application materials, two of whom have law degrees from TMSL. The decision was based on race, not merit, and violates the law. There were 6 applicants for 3 titles:

      a.    All four black applicants either received a title or were in a run-off vote to receive a title.

      b.    The two white applicants (Walter Champion and Plaintiff) neither received a title nor made it to a run-off vote.

      c.    The two white applicants have published numerous books or numerous top 20-30 law review articles, while the black title recipients had published no books, no top 20 law review articles (some did not have even a single top 100 law review article published), and have nowhere near the scholarly recognition or scholarly impact as the white applicants.

      d.    Within a day or two of the vote to take away Plaintiff's title, Defendant Douglas and McKen Carrington (neither of whom have *any* scholarship to speak of, after decades of teaching law school, and both of whom receive $100,000.00 or more per year more than Plaintiff) saw Plaintiff in the law school and laughed as they passed by her, looking right at her, demonstrating how they rejoice in racial injustice by depriving Plaintiff of compensation that they knew she had earned.

59.    In response to the racially-motivated vote to give titles to less-deserving black professors and deny the same to deserving white professors, Plaintiff and a law professor from the University of Alabama wrote to the dean, requesting that he disregard the racially-motivated vote of a skewed portion of the faculty and allow Plaintiff to keep her well-deserved title, which the dean had the power to do. Plaintiff requested an outside review, which could have been conducted per the TMSL policy manual, so that the title awards could be based on merit, as opposed to race. She pointed out that the applicants who were awarded titles objectively did not deserve them and/or failed even to comply with the application guidelines distributed by TMSL for the title application process. By letter dated May 19, 2016, the dean informed Plaintiff that he would rubber-stamp the faculty recommendation and award the titles to the three black law professors despite the evidence that the vote was racially motivated, not merit-based, not consistent with the requirements for titles set forth in the TSU and TMSL faculty manuals or industry standards, and an ultra vires racially-motivated expenditure of taxpayer dollars.

60.    The following year, soon after Plaintiff filed her EEOC Charge of Discrimination, Plaintiff was again denied a title. The title was instead given to a black male professor over Plaintiff, despite Plaintiff's far superior scholarship record, superior scholarly recognition in the legal academy and worldwide, and

superior title application materials. Again, the decision was based on race and gender, not merit.

61.     Between 2015 and 2018, Plaintiff repeatedly asked to be considered for an administrative position, to help with bar preparation, and to direct a program, like many of her colleagues with far inferior academic qualifications and performance records. Plaintiff was denied every time while non-white and male colleagues with inferior credentials and work product were given lucrative positions in the dean's office or directing programs. Despite Plaintiff's repeated requests to teach bar preparation, even without compensation, bar review sessions were given to black or male professors who do not even teach the Plaintiff's subject of expertise (torts), who have never written questions or model answers for a real bar exam (Plaintiff has), who presented invalid torts questions to students, and could not answer students' questions about torts. (*See* Exhibit B). These other professors were given significant additional income for their incompetent attempts to prepare students for the bar exam. On information, this additional income and other additional income paid to male professors has not been reported by TSU in violation of the law. Plaintiff nonetheless conducted lengthy bar preparation classes in the evenings to assist her students, without compensation, while her less qualified male and black colleagues received compensation for attempting to teach subjects that they do not understand, thereby causing distress to law students, some

of whom then frantically called Plaintiff for help. In keeping with its custom, TMSL made race and gender-based compensation decisions contrary to merit and to the detriment of the law students, in violation of the law.

### F.      Continuing harassment and retaliation

62.      On or about September 15, 2016, Plaintiff personally delivered to Douglas (the law school dean at that time), TSU Human Resources, and TSU President Austin Lane's office a ten-page detailed complaint of unequal pay, discrimination, and harassment based on race and gender, including 163 pages of exhibits. Plaintiff hoped to resolve the issues informally and waited patiently for a response for many months. Plaintiff never received a response to this detailed complaint and TSU took no corrective action whatsoever in response to this detailed and factual account of pervasive, continuing racial and gender harassment.

63.      Near the end of the summer of 2016, Plaintiff received a call from Defendant Otero, informing Plaintiff that Otero was the chair of the Academic Standards Committee, and that a student had lodged a charge of discrimination against Plaintiff. No student had lodged a complaint against Plaintiff previously, in sixteen years of teaching at five different law schools. The student was known to the administration to have numerous problems, including psychological, medical, academic and very serious credibility problems and disputes with many persons at the law school. On information, Defendant Colon instructed the student to lodge a

discrimination complaint against Plaintiff. Defendants Otero, Walker and Anga, along with Otero's student assistant (Andrea Curtiss, a.k.a. Andrea Kurzac), made up a majority of the Academic Standards Committee. Plaintiff requested information concerning the student to use in her defense of the false charge of discrimination, but Otero refused to provide such information. Plaintiff spent hours documenting the reasons why the student received a "D" grade in Plaintiff's class, which grade was assigned by the law school, not Plaintiff. All of Plaintiff's exams are blind graded, and Plaintiff showed that the student failed a year-end comprehensive exam that was worth 50% of the overall grade and was written and graded primarily by other professors. During the committee meeting in which Plaintiff had to defend herself against the absurd discrimination complaint, Anga and Curtiss were openly hostile to Plaintiff, Curtiss shouted at plaintiff, and both Anga and Curtiss rudely informed Plaintiff that they were in control of her fate relative to the student's discrimination complaint. Despite no evidence of discrimination, Defendants Otero, Walker, Anga and Curtiss recommended a finding of discrimination against Plaintiff. The dean refused to support the committee's recommendation, based on "no evidence" that Plaintiff discriminated against the student. The student later attempted to "transfer" to another law school by submitting false application materials to another law school. The student claimed to have passed his first year of law school at TMSL, apparently submitted

a falsified transcript, and was caught by the Law School Admission Council. The student then returned to TMSL and attended classes for a day or two, refusing to acknowledge that he had failed out of law school.

64.   On or about January 26, 2017, Plaintiff visited the EEOC office in Houston and was treated with hostility by a black woman later identified as a TMSL graduate. On January 27, 2017, former law school dean McKen Carrington yelled at Plaintiff in the law school lounge simply because Plaintiff suggested that Rebecca Stewart, a well-qualified white professor with a Harvard law degree, teach a first-year class to benefit the law students relative to a subject tested on the bar exam. Carrington raised his voice and told Plaintiff that she was not privy to the contract with Stewart, and when Plaintiff tried to walk away, he yelled at her not to leave the lounge. Later that day, Defendant Douglas, who was the interim dean at that time, called Plaintiff into his office to inform her that a "complaint" had been lodged against her by Defendants Otero and Walker. It was obvious to Plaintiff that people at TMSL were aware that she had visited the EEOC office the day prior, and Plaintiff was immediately subjected to retaliation and harassment.

65.   On February 1, 2017 Plaintiff filed a Charge of Discrimination with the EEOC based on race, sex, retaliation, and unequal pay. The Charge of Discrimination was filed within 300 days of the adverse employment decision to deny Plaintiff a title and also within 300 days of various acts of harassment that

had a cumulative effect of creating a very hostile work environment based on race and gender. Thereafter, the harassment intensified, and Plaintiff was subjected to increased harassment. Persons who previously had not harassed Plaintiff began to harass Plaintiff after Plaintiff filed her EEOC Charge. In addition, the harassment perpetrated by certain persons in the past increased greatly after Plaintiff filed her EEOC Charge. But for Plaintiff's decision to exercise her rights and file the EEOC Charge, she would not have been subjected to unlawful and retaliatory conduct. The retaliatory harassment includes:

  a. Defendant Douglas, McKen Carrington, and Defendants Colon and Anga became verbally aggressive and loud toward Plaintiff, reprimanding her or yelling at her at every opportunity, to punish her for filing an EEOC Charge.

  b. Plaintiff was denied increased responsibilities with increased pay, such as bar preparation and directing a civil rights program, despite other professors receiving extra pay for similar activities.

  c. On April 17, 2017, Defendant Anga (a TMSL graduate) sat in her car near Plaintiff's reserved parking space, then pulled into Plaintiff's reserved parking space just as Plaintiff approached her parking space. Anga got out of her car, rudely told Plaintiff that Plaintiff is undeserving of a parking space, and physically charged at Plaintiff when Plaintiff asked her to

move her car. Anga got within ten inches of Plaintiff's face and shouted in an angry manner, "What are you going to do about it!?" Defendant Anga's behavior was personal, she made bizarre personal attacks concerning Plaintiff, and she was not acting in an official capacity or in the course and scope of her job at TMSL. Plaintiff had made a series of complaints about not being able to park in her parking space at school and being late to class as a result, Anga was aware of the problem, and Anga intentionally and maliciously caused Plaintiff to be late to her class, again. Defendant Anga's conduct was invasive, highly offensive, intrusive and disruptive to Plaintiff's ability to do her job. Anga's conduct was in the view of security cameras, but TSU/TMSL has failed to supply the footage after repeated requests, covering up Anga's misconduct. Such conduct constitutes spoliation of evidence given that TSU was knowledgeable that Plaintiff had EEOC charge pending, and that Anga's conduct would likely result in litigation. In addition, Plaintiff went to TSU Human Resources the same day of the incident to complain, and then submitted a written complaint. TSU did not conduct a reasonable investigation or take corrective action.

d.     On numerous occasions, hostile black individuals were sitting or standing directly in front of Plaintiff's parking space as she drove onto campus or got into her car to leave campus, and stared Plaintiff down for

several minutes, refused to respond when Plaintiff said, "Hello," and glared at Plaintiff until she left the area. The names of these individuals are not known to Plaintiff. Plaintiff's car has been scratched and dinged on the driver's side door repeatedly while parked in the law school parking lot.

e.    On October 27, 2017, Plaintiff attended a Gender Equity Committee meeting at the law school that she was invited to attend, as a female with a gender discrimination concern. Lupe Salinas, a male professor, made derogatory statements about Plaintiff's motive in attending the meeting and stated that he was concerned that Plaintiff came to the meeting for her own agenda, *i.e.*, in furtherance of her EEOC case and to create evidence for a lawsuit. Plaintiff was reprimanded and felt embarrassed by the statements, which were made in front of numerous colleagues.

f.    In October, 2017, Plaintiff's law students informed her that they were concerned that there was a "conspiracy" among certain students to give Plaintiff unfair and derogatory teaching evaluations, to "put Professor Pollard in her place." Plaintiff's assistant at that time, Misty Bishop (who Plaintiff had requested to be replaced due to the assistant's very rude and inappropriate behavior toward Plaintiff) conducted the evaluation and made statements derogatory of Plaintiff at the time of the evaluations. Upon information, she did so on the direction of the Individual Defendants. Then,

in the spring of 2018, another law student expressed concern that Plaintiff's evaluations would not be fair because someone sent out a global "free pizza" text message soon after the students began filling out the Plaintiff's teaching evaluations, such that students left to get free pizza.

g.     On November 6, 2017, Plaintiff attended a faculty meeting concerning professors who taught first year subjects that were tested on the bar exam. The prior year, the faculty voted to examine the students by essay exam, and yet only Plaintiff and one or two other professors followed the decision and examined students by essay exams. Plaintiff mentioned the need for proper essay exam testing, and Defendants Colon and Anga raised their voices over Plaintiff such that she was not allowed to speak, even when the chair recognized Plaintiff as the proper speaker. Colon carried on, reprimanding Plaintiff for her valid comments, and continued his loud, emotional tirade directed at Plaintiff for such a long period that Plaintiff finally was forced to leave the room.

h.     In November, 2017, Larry Weeden interfered with Plaintiff's application for a sabbatical leave of absence to finish her book. Plaintiff's sabbatical application was the only completed application with a specific "plan" for a substantial publication resulting from the sabbatical, as required by the application process. During committee proceedings to recommend a

sabbatical leave, Weeden raised his voice over the committee chair, demanded that students vote (contrary to the state funding statute), and suggested that the committee misinform the dean about the outcome of the committee vote. Plaintiff spent many hours over several weeks pulling the funding statute and writing numerous emails to the dean and other administrators to convince them that the vote was improper, and Plaintiff was the qualified candidate for a sabbatical.

i.      On April 11, 2018, Plaintiff organized a long review session to help the students prepare for the torts portion of the bar exam. Plaintiff sent out notices to the IT Department that she would need certain technology in the room to conduct the review session and was assured that the technology was normally in the room, as it had been for months. Then, either the day of the review session or the prior evening, someone removed the equipment from the room, such that it was not available during Plaintiff's review session. This was disruptive to the review session and made it harder for the student to follow along. This is just one of many examples of the rampant harassment and job interference that Plaintiff is subject to at TMLS on a regular, ongoing basis, based upon her race and gender, which was amped up after Plaintiff lodged an EEOC Charge.

66.    On May 11, 2018, Plaintiff filed an Amended Charge of Discrimination with the EEOC, to add facts concerning ongoing harassment and retaliation since the original EEOC Charge of Discrimination. On May 11, 2018, Plaintiff attended the hooding ceremony so that she could hood some of her students. Plaintiff stood with other professors, waiting for her students to walk up so that she could hood them. Trudy Green, with whom Plaintiff formerly had a good working relationship, screamed at Plaintiff to "sit down!" glaring directly at Plaintiff. Plaintiff was embarrassed by Green's loud and condescending command, and sat down to avoid an ongoing confrontation, which made it more difficult to see her students walk up so that she could hood them.

67.    The Defendants' conduct has been concerted, intentional, and malicious, based on racial and gender animus, and anger over Plaintiff's decision to assert her civil rights by filing an EEOC Charge. Each Defendant is jointly and severally liable for each other Defendant's misconduct, and each is responsible for all of Plaintiff's injuries and losses caused by the misconduct.

68.    Plaintiff has made a number of complaints of discrimination, harassment, physical aggression, and retaliation to TSU Human Resources, as well as the law school and university administration, and no reasonable investigation or corrective action has been taken. Instead, TSU has ratified the unlawful conduct.

## V.     CAUSES OF ACTION

### COUNT 1

### Title VII Hostile Work Environment Against TSU

69.     The preceding paragraphs are fully incorporated as if set forth fully herein.

70.     The Defendant TSU's conduct violates Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment on the basis of race and sex.

71.     Plaintiff is a racial minority at Texas Southern University and female. She has been subjected to intense, daily, extreme harassment, including physical assault on a few occasions, while in the law school or in the parking lot. Plaintiff has been subjected to racist, anti-white statements, and comments concerning physical appearance and sexuality, on a regular and ongoing basis. The comments were unwelcomed and very offensive, Plaintiff perceived the environment to be very abusive and hostile, as any reasonable person would.

72.     The anti-white sentiment is constant, and so prevalent and accepted/ratified by TSU and TMSL that Tamoria Jones, a prominent TMSL student and Chief of Staff for a TMSL graduate Texas Legislator (Harold Dutton) wrote on Facebook: **"lmao!!! You know I got go out with a BANG!!! I'm not letting these whites make it …[shouting icon] they gonna [sic] respect the**

Negroes of the TMSL." The Facebook response: "my point exactly!!!!" (*See* Exhibit A). The Facebook post went viral at TSU, yet a few months later, the student was featured in an edition of the law school's periodical, Thurgood Today. TMSL ratified and applauded the blatant racist and hostile Facebook post, which accurately reflects the anti-white sentiment at TMSL. Plaintiff was told point blank that certain professors do not want her in the law school because she is white, and that TMSL is "their" law school (meaning the non-white professor's law school). Plaintiff has been singled out for a great variety of negative treatments, as set forth herein above, because she is Caucasian and female.

73.    Colon's conduct in showing a photo of a stripper around the law school and constantly making comments about women's physical appearance is unwelcomed and harassing.

74.    The conduct is severe and pervasive to the point that it alters the conditions of Plaintiff's employment, permeates every aspect of the Plaintiff's job including physical safety and technology, and makes it very difficult for Plaintiff to get the simplest of tasks accomplished. Plaintiff is underpaid, denied opportunities that are routinely given to less qualified blacks and males, shouted down in faculty meetings, and not allowed to participate in faculty governance or solutions to the very serious ABA crisis, among many other hostile and harassing acts perpetrated by non-white or male professors. The harassment is motivated by race and gender,

and is sufficiently severe to create an abusive and very hostile work environment by any reasonable person's standards.

75.     Numerous     sexual     harassment,     gender-based,     and     race-based complaints have been lodged against the law school, and TSU and TMSL have taken no reasonable corrective action for many years. Plaintiff's treatment is par for the course. She has engaged in protected activity by lodging EEOC Charges and other complaints about the hostile work environment (as have numerous others), and subsequently suffered additional adverse employment decisions, and was screamed at inside of the law school repeatedly by Defendants Colon, Anga, and others after filing her original EEOC Charge. Plaintiff was denied a title again after filing her EEOC Charge, was denied a position as a director, and was denied the opportunity to help with bar preparation, all of which had adverse financial and career advancement consequences for Plaintiff. The hostile and abusive environment that existed prior to Plaintiff's original EEOC Charge intensified after Plaintiff filed her EEOC Charge, and Plaintiff filed an amended EEOC Charge and additional complaint to TSU Human Resources as a result.

76.     Plaintiff has suffered damages as a result of the hostile and abusive work environment and retaliation in response to her EEOC Charges and complaints of discrimination and harassment.

77.     The harassment is grounded in racial and gender animus, is extraordinary, physically threatening, and permeates every aspect of the work environment. The intensity of the harassment has affected the terms and conditions of Plaintiff's employment, and the intense harassment has also resulted in very costly and tangible adverse employment decisions as well. TMSL has a long history of race and sex discrimination, and race and sex were motivating factors in Defendant's terribly abusive treatment of Plaintiff.

78.     Plaintiff complained to the TSU president and acting dean of the law school, Douglas, providing a detailed complaint with evidence attached as exhibits. TSU and TMSL did nothing in response to Plaintiff's detailed complaint for more than two years, thus necessitating this lawsuit. Plaintiff has suffered damages and other injury as a result.

79.     Plaintiff timely met all filing prerequisites and filed this lawsuit timely.

## COUNT 2

### Title VII Retaliation Against TSU

80.     The preceding paragraphs are fully incorporated as if set forth fully herein.

81.     Defendant TSU's conduct violates Title VII of the Civil Rights Act of 1964. Title VII prohibits retaliation for engaging in a protected activity such as complaining about racial and sexual harassment.

82.     Plaintiff participated in a protected activity and lodged complaints about the hostile work environment and discriminatory treatment such as adverse employment decisions arising from the hostile work environment.

83.     TSU further harassed Plaintiff and took additional adverse employment actions against Plaintiff subsequent to her complaints of race and sex discrimination, as set forth herein above. The retaliatory actions were intended to, and reasonably would discourage TSU employees from making discrimination complaints, to avoid being targeted for such angry and hostile conduct. Other law professors at TMSL have similarly experienced retaliation for complaining about race and sex harassment and discrimination, as alleged herein, and retaliation is TSU's typical response to complaints of racial and gender harassment and discrimination.

84.     TSU's additional adverse employment actions resulted from and were caused by her valid, candid complaints of sex and race discrimination, as set forth herein above. Plaintiff timely met all filing prerequisites and filed this lawsuit timely.

## COUNT 3

### Equal Pay Act Violation Against TSU

85.     The preceding paragraphs are fully incorporated as if set forth fully herein.

86.     Defendant TSU is subject to the Equal Pay Act.

87.     TSU employs Plaintiff and male law professors in the same capacity, and the same rank. The law professor positions require substantially equal skill, effort, and responsibility.

88.     The males and Plaintiff perform similar jobs under similar working conditions. Plaintiff performed as well, if not better, than many male professors, including Lupe Salinas, Manual Leal, Okezie Chukwemerjie, Gabriel Aitsebaomo, and Larry Weeden.

89.     Plaintiff is paid less than male employees doing substantially equal work.

90.     TSU is well-aware of its long history of gender-based discrimination policies. TSU was reprimanded by the American Bar Association for not taking

remedial action in response to the many complaints of unequal pay based on gender. Defendant's conduct in paying Plaintiff less than males has been intentional and willful, subjecting TSU to three years' salary differential from the date the lawsuit was filed to the judgment.

91.     Plaintiff filed complaints and EEOC Charges, asserting rights under the Equal Pay Act, and was subsequently subjected to adverse action as a result of her complaints, As a result of Defendant's discriminatory gender-based pay differences, Plaintiff has suffered damages and injury.

## COUNT 4

### 42 U.S.C. Section 1983 Civil Rights Violations

### (Predicated on 42 U.S.C. Section 1981, the Equal Protection Clause,

### the Due Process Clause, and the Fourth Amendment)

### Against All Defendants

92.     The preceding paragraphs are fully incorporated as if set forth fully herein.

93.     Pursuant to 42 U.S.C. Section 1983, Plaintiff may bring a claim for damages and injunctive relief for Individual Defendants' violation of Plaintiff's rights secured by the Constitution or federal law, including rights secured by the equal protection clause, the due process clause (both procedural and substantive),

the fourth amendment, and rights secured by 42 U.S.C. Sec. 1981. Plaintiff may also seek prospective injunctive relief against TSU.

94.    42 U.S.C. Section 1981 is a federal law that prohibits racial discrimination, harassment, and retaliation with respect to the making, performance, modification and termination of contracts, and the benefits, privileges, terms and conditions of the contractual relationship. Individual Defendants have intentionally and maliciously, and in concert with each other, deprived Plaintiff of benefits of employment, violated TSU's own faculty manuals that set forth due process for awarding benefits of employment, discriminated against her based on her race and gender, harassed Plaintiff and retaliated against her for complaining about it, as set forth herein above.

95.    Individual Defendants have taken the action they have based on racial animus and misogyny, and they have acted in concert with malicious intent.

96.    Individual Defendants have acted under color of state law. They have abused their power as government employees and they have subverted TSU processes for their own racist and misogynist purposes, in violation of the law. Defendants have retaliated against Plaintiff as well. TSU has looked the other way, encouraged or ratified the individual Defendants' misconduct.

97.    As a result of Individual Defendants' violations of Plaintiff's rights under the equal protection clause, the due process clause, the Fourth Amendment,

and rights secured by 42 U.S.C. Sec. 1981, she has suffered lost pay and benefits, and other injury.

## COUNT 5

### Invasion of Privacy

### Against Anga, Colon, Douglas, Otero, and Walker

98.    The preceding paragraphs are fully incorporated as if set forth fully herein.

99.    Defendants share a racist agenda and have intentionally and maliciously intruded upon Plaintiff's solitude, seclusion and private affairs, physically and otherwise, and have interfered with her ability to do her job and to get to class on time. Defendants have physically and offensively touched the Plaintiff, threatened the Plaintiff with harmful or offensive physical contact, blocked the Plaintiff physically, lied about the Plaintiff to students, interfered with Plaintiff's relationships with students, and made numerous false allegations against Plaintiff for the purpose of harassing her, interfering with her job, and slowing down her scholarly productivity. The defendants have acted outside of the course and scope of their jobs, to interfere with Plaintiff's solitude, success, and peace of mind.

100.   The Individual Defendants' actions are highly offensive and invasive to any reasonable person, and were highly offensive and invasive to Plaintiff.

101.   The Individual Defendants have combined forces, worked together, and conspired to harm the Plaintiff because of her race, and to force her out of TSU.

102.   As set forth herein, each Individual Defendant has taken numerous actions in furtherance of a continuing course of invasive and uncivilized conduct and ongoing plan to harm Plaintiff. This includes acts of physical assault, following Plaintiff to her car or waiting for Plaintiff near her parking spot so as to confront her and harass her, screaming in Plaintiff's face and in front of third parties, taking Plaintiff's cell phone and hiding it from her to harass her, and lying to third parties about the Plaintiff to humiliate and embarrass Plaintiff among many other harassing and invasive acts that have significantly interfered with Plaintiff's right of privacy.

## VI.   CONDITIONS PRECEDENT

103.   All conditions precedent to Plaintiff's claim for relief have been performed or have occurred.

## VII.   DEMAND FOR JURY TRIAL

104.   Plaintiff, DEANA POLLARD SACKS, asserts her rights under the Seventh Amendment to the U.S. Constitution, and other federal law, and demands in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## VIII.  CONCLUSION AND PRAYER

WHEREFORE, Plaintiff prays that as follows:

On The First Cause of Action

a)     For an award of damages to compensate Plaintiff for her economic losses, including back pay, lost wages, and other lost benefits of employment;;

b)     For prospective injunctive relief compelling Plaintiff to have a title restored or for an increased base pay in the same amount;

c)     For prospective injunctive relief providing Plaintiff with fair and equal compensation in the future;

d)     For prospective injunctive relief prohibiting unlawful conduct in the future;

e)     For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

f)     For an award of costs of this action, together with reasonable attorneys' fees and expert witness fees;

g)     For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

h)     For such other and further relief as the court deems just and proper.

On The Second Cause of Action

a)      For an award of damages to compensate Plaintiff for her economic losses, including back pay, lost wages, and other lost benefits of employment;

b)      For prospective injunctive relief compelling Plaintiff to have a title restored or for an increased base pay in the same amount;

c)      For prospective injunctive relief providing Plaintiff with fair and equal compensation in the future;

d)      For prospective injunctive relief prohibiting unlawful conduct in the future;

e)      For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

f)      For an award of costs of this action, together with reasonable attorneys' fees and expert witness fees;

g)      For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

h)      For such other and further relief as the court deems just and proper.

On The Third Cause of Action

a)      For an award of damages to compensate Plaintiff for her economic losses, including back pay, lost wages, and other lost benefits of employment, as well as special compensatory damages;

b)      For an award of statutory treble or liquidated damages pursuant to the Equal Pay Act;

c)      For prospective injunctive relief compelling Plaintiff to have a title restored or for an increased base pay in the same amount;

d)      For prospective injunctive relief providing Plaintiff with fair and equal compensation in the future;

e)      For prospective injunctive relief prohibiting unlawful conduct in the future;

f)      For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

g)      For an award of costs of this action, together with reasonable attorneys' fees and expert witness fees;

h)      For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

i)      For such other and further relief as the court deems just and proper.

On The Fourth Cause of Action

a)      For an award of damages to compensate Plaintiff for her economic losses, including back pay, lost wages, and other lost benefits of employment (Against Individual Defendants only);

b)      For an award of punitive damages (Against Individual Defendants only);

c)      For prospective injunctive relief compelling Plaintiff to have a title restored or for an increased base pay in the same amount;

d)      For prospective injunctive relief providing Plaintiff with fair and equal compensation in the future;

e)      For prospective injunctive relief prohibiting unlawful conduct in the future;

f)      For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

g)      For an award of costs of this action, together with reasonable attorneys' fees, and expert witness fees;

h)      For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

i)      For such other and further relief as the court deems just and proper.

On The Fifth Cause of Action

a)      For an award of damages to compensate Plaintiff for the interference of her right of privacy, her right to be left alone to do her job in peace, and intrusion into her seclusion, her economic losses, including back pay, lost wages, and other lost benefits of employment;

b)      For an award of punitive damages;

c)      For injunctive relief prohibiting defendants' harassment and unlawful conduct in the future, and to restrain the defendants from getting within 15 feet of the Plaintiff or physically contacting the Plaintiff in the future;

d)      For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

e)      For an award of costs of this action, together with expert witness fees;

f)      For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

g)      For such other and further relief as the court deems just and proper.

Respectfully submitted,

**/s/ David J. Sacks_____**

| | |
|---|---|
| Andrew J. Cobos | David J. Sacks |
| BELL, ROSE & COBOS LLP | Attorney in Charge |
| State Bar No. 24078352 | SACKS LAW FIRM |
| Southern District No. 1322524 | State Bar No. 17505700 |
| 2201 Hermann Drive | Federal Bar No. 6095 |
| Houston, TX 77004-7613 | 2323 S. Shepherd, Suite 825 |
| Email: | Houston, TX 77019 |
| andrew@bellroselaw.com | Email: |
| Telephone:  (713) 300-5158 | david@sackslawfirm.com |
| Facsimile:   (713) 863-0502 | Telephone:  (713) 863-8400 |
| Attorney for Plaintiff | Facsimile:   (713) 863-0502 |
| | Attorney for Plaintiff |

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was served

through CM/ECF filing, on this the 29th day of March, 2019, to:

Drew L. Harris
ASSISTANT ATTORNEY GENERAL
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Email:      drew.harris@oag.texas.gov
Facsimile:   (512) 320-0667
Attorney for Defendants

**/s/ David J. Sacks_____**